1
2
3
4
5
6
7
8

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

9  | ALVIN R. ROSS,                     CASE NO. 1:03-CV-06572 LJO P

10 |                 Plaintiff,         ORDER GRANTING IN PART AND
   |                                    DENYING IN PART DEFENDANTS'
11 |    v.                              MOTION FOR SUMMARY JUDGMENT

12 | J. R. BUSBY, et al.,               (Doc. 69)

13 |                 Defendants.
   | _____/

14

15 | I.    Order

16 |       A.    Procedural History

17        Plaintiff Alvin R. Ross ("plaintiff") is a state prisoner proceeding pro se and in forma

18 pauperis in this civil rights action pursuant to 42 U.S.C. § 1983 and California tort law.  This action

19 is proceeding on plaintiff's complaint, filed November 10, 2003, against defendants Busby,

20 Chatham, Ortiz, and Stockman ("defendants") under section 1983 for retaliation and under

21 California law for negligence.[1]   On October 13, 2005, defendants filed a motion for summary

22 judgment. (Doc. 69.) After obtaining extensions of time, plaintiff filed an opposition to defendants'

23 motion on February 3, 2006, and defendants filed a reply on February 17, 2006.[2]

24

25        [1] Plaintiff's due process and Sixth Amendment claims were dismissed from this action for failure to state
26 any claims upon which relief may be granted, and plaintiff voluntarily dismissed defendants Galaza and Hall from
   this action.  (Docs. 19, 50, 59.)

27        [2] Plaintiff's surreply, filed March 6, 2006, is not considered by the Court.  (Doc. 80)  Neither the Federal
   Rules of Civil Procedure nor the Local Rules provides for a surreply, plaintiff did not seek leave to file a surreply,
28 and the Court did not request a surreply.

1        B.      Legal Standard

2        Summary judgment is appropriate when it is demonstrated that there exists no genuine issue

3    as to any material fact, and that the moving party is entitled to judgment as a matter of law.  Fed. R.

4    Civ. P. 56(c).  Under summary judgment practice, the moving party

5                [A]lways bears the initial responsibility of informing the district court
             of the basis for its motion, and identifying those portions of "the
6             pleadings, depositions, answers to interrogatories, and admissions on
             file, together with the affidavits, if any," which it believes
7             demonstrate the absence of a genuine issue of material fact.

8    Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  "[W]here the nonmoving party will bear the

9    burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made

10   in reliance solely on the 'pleadings, depositions, answers to interrogatories, and admissions on file.'"

11   Id.  Indeed, summary judgment should be entered, after adequate time for discovery and upon

12   motion, against a party who fails to make a showing sufficient to establish the existence of an

13   element essential to that party's case, and on which that party will bear the burden of proof at trial.

14   Id. at 322.  "[A] complete failure of proof concerning an essential element of the nonmoving party's

15   case necessarily renders all other facts immaterial."  Id.  In such a circumstance, summary judgment

16   should be granted, "so long as whatever is before the district court demonstrates that the standard

17   for entry of summary judgment, as set forth in Rule 56(c), is satisfied."  Id. at 323.

18       If the moving party meets its initial responsibility, the burden then shifts to the opposing

19   party to establish that a genuine issue as to any material fact actually does exist.  Matsushita Elec.

20   Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  In attempting to establish the existence

21   of this factual dispute, the opposing party may not rely upon the denials of its pleadings, but is

22   required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery

23   material, in support of its contention that the dispute exists.  Fed. R. Civ. P. 56(e); Matsushita, 475

24   U.S. at 586 n.11.  The opposing party must demonstrate that the fact in contention is material, i.e.,

25   a fact that might affect the outcome of the suit under the governing law, Anderson v. Liberty Lobby,

26   Inc., 477 U.S. 242, 248 (1986); T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d

27   626, 630 (9th Cir. 1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable

28   ///

jury could return a verdict for the nonmoving party, <u>Wool v. Tandem Computers, Inc.</u>, 818 F.2d 1433, 1436 (9th Cir. 1987).

In the endeavor to establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." <u>T.W. Elec. Serv.</u>, 809 F.2d at 631. Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" <u>Matsushita</u>, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory committee's note on 1963 amendments).

In resolving the summary judgment motion, the Court examines the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any. Fed. R. Civ. P. 56(c). The evidence of the opposing party is to be believed, <u>Anderson</u>, 477 U.S. at 255, and all reasonable inferences that may be drawn from the facts placed before the Court must be drawn in favor of the opposing party, <u>Matsushita</u>, 475 U.S. at 587 (citing <u>United States v. Diebold, Inc.</u>, 369 U.S. 654, 655 (1962) (per curiam). Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn. <u>Richards v. Nielsen Freight Lines</u>, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), <u>aff'd</u>, 810 F.2d 898, 902 (9th Cir. 1987).

Finally, to demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts. Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" <u>Matsushita</u>, 475 U.S. at 587 (citation omitted).

       C.     <u>Undisputed Facts</u>

               1.     <u>Facts Relating to Application of Statute of Limitations and Equitable Tolling Doctrine</u>

1.     Plaintiff was sentenced to life without the possibility of parole on November 26, 1979.

2.     On December 13, 2001, plaintiff filed an inmate appeal (form CDC-602) claiming prison staff retaliated against him.

3.  The inmate appeal was assigned log number 02-254, and was completed with a Director's Level decision on August 19, 2002.[3]

4.  On September 9, 2002, plaintiff filed claim number G 529448 with the California Victim Compensation and Government Claims Board ("Board"), formerly known as the State Board of Control, alleging that he was placed in administrative segregation and wrongfully transferred because of his group appeal against defendant Busby.

5.  Board claim G 529448 was denied on October 25, 2002.

6.  Plaintiff filed a separate Board claim, number G 534651, alleging the same claims as those in Board claim G 529448 and adding that defendant Busby acted in a retaliatory manner by confining him to quarters on October 12, 2001.[4]

7.  Board claim G 534651 was denied on May 23, 2003.

     2.   Facts Relating to Retaliation Claims Against Defendants Busby and Chatham

8.  During 2001, plaintiff was the chairman of the Men's Advisory Committee ("MAC").

9.  The MAC's purpose is to act as a liaison for inmates and institutional administration. When inmates want a program or policy that will help them, the MAC council will present the idea and lobby for its implementation. Similarly, when the institution wants to institute a new policy that will require inmate cooperation, staff members express the plan to MAC members and request the MAC representatives communicate the policies to the inmate population.[5]

---

[3] Plaintiff purports to admit in part and deny in part this fact. (Doc. 81, p. 1.) However, plaintiff's desire to add explanatory detail does not bring this fact into dispute, and it is deemed undisputed.

[4] Plaintiff's denial of this fact is not on point and is not supported by the evidence. Although defendants do not actually set forth in this fact which claim was filed first, plaintiff contends that claim G 534651 was prepared before claim G 529448 and points to the date of the incident grieved as evidence. (Doc. 81, p. 2.) The date of the incident grieved is not evidence of the date the claims themselves were prepared and filed. Claim G 529448 bears a Board date stamp of September 9, 2002, and claim G 534651 bears a Board date stamp of March 7, 2003, demonstrating that claim G 529448 was submitted to the Board first. (Doc. 69-4, Def. Ex. L, M.) Letters from the Board pertaining to each claim also support this, and demonstrate that claim G 529448 was denied by the Board approximately four months before claim G 534651 was filed with the Board. This fact is therefore deemed undisputed. (Id.)

[5] Although plaintiff purports to dispute this fact in part, plaintiff has not cited to any evidence in support of his partial denial. Further, having read both the fact and plaintiff's purported partial denial, the Court cannot ascertain the basis of plaintiff's denial. Although worded different by the parties, defendants and plaintiff appear to be saying essentially the same thing. This fact, which is not dispositive of any issue in any event, is deemed undisputed.

4

10.     Bylaws require that the MAC council meet with correctional sergeant and staff once per month, and that the Associate Warden be present at the meetings quarterly.[6]

11.     The MAC council is generally composed of racially diverse inmates, although sometimes when there are institutional tensions between certain racial groups and prison staff, MAC members belonging to that racial group step down.[7]

12.     There are groups of inmates belonging to all racial groups that are suspicious of the MAC because they believe the MAC is too friendly with law enforcement.[8]

13.     Many inmates believe MAC members are more likely to be snitches, or to use the position on the MAC to gain the favor of law enforcement.[9]

14.     On October 5, 2001, plaintiff submitted a group inmate appeal.

15.     The appeal claimed that correctional staff members were too busy having potlucks and "kicking back" to release inmates for yard time.

16.     Plaintiff delegated the task of collecting signatures to the MAC building representatives.

17.     The group appeal was signed by approximately four-hundred inmates.

18.     On October 12, 2001, defendant Busby confined plaintiff to quarters and issued plaintiff a form CDC-128-B chrono explaining why plaintiff was confined to quarters.[10]

19.     Defendant Busby informed defendant Chatham of his preliminary discoveries on October 16, 2001.

///

---

[6] Plaintiff attempts to raise a dispute as to this fact by citing to Departmental Operations Manuel (DOM) section 53120.11.3.  The by-laws referred to by defendants in this fact are separate from the DOM regulations themselves.  DOM § 53120.16.  Therefore, the evidence cited to by plaintiff does not bring this fact into dispute.

[7] The deposition transcript section cited to by plaintiff in support of his denial of this fact does not bring this fact into dispute.

[8] Although plaintiff purports to deny this fact, he submits no evidence bringing it into dispute.  To the extent that plaintiff is challenging defendants' evidence supporting this fact for lack of foundation, plaintiff has tendered no argument that defendant Chatham is not qualified to attest to this fact in his declaration.

[9] See footnote 8.

[10] A chrono is a document prepared by staff which contains information pertaining to an inmate.  (See e.g., Doc.69-3, Def. Ex. D.)

20.   On October 17, 2001, defendant Chatham called plaintiff to his office and suspended plaintiff from his duties as MAC chairman.

21.   Defendant Chatham issued plaintiff a form CDC-128-B chrono, explaining the reasons plaintiff was suspended from the MAC.

22.   Defendant Chatham released plaintiff from confined to quarters status.

23.   Defendant Chatham told plaintiff that he would remain in the general population and free of administrative segregation only as long as plaintiff did not jeopardize the investigation in any way.

24.   Plaintiff submitted his own individual grievance against defendant Busby, claiming that defendant Busby's act of confining plaintiff to quarters was unfair.  A portion of the appeal states:

> In my mind I was wondering why didn't sergeant Busby lock-up the individuals who made this alleged threats on me, to him for safety and security reasons.  However, it was Sergeant Busby who selected these inmates from the group appeal listing (in his own words), in an alleged attempt to interview the inmates.  According to Busby, these inmates signed the 128 chrono's stating that a second sheet of the group appeal was added after they signed it, which is untrue, and can be refuted by several other inmates who was not interviewed or considered for interview. It was later learned that the inmates who signed the 128 chronos was in very good standing with Busby and did not want to be apart of the appeal because it appeared to be going against Busby, which whom they are "cool" with.

D.   Discussion

1.   Statute of Limitations and Application of Equitable Tolling

Defendants argue that they are entitled to judgment as a matter of law because plaintiff's claims are barred by the statute of limitations.  Defendants argue that even according plaintiff the benefit of equitable tolling does not save some of plaintiff's claims from dismissal, as suit was filed more than one year after exhaustion of the administrative remedies occurred for those claims. Plaintiff argues that he filed several grievances at the prison and then with the Board,  and filed suit within six months of the date the Board rejected his second and final claim.

Federal law determines when a civil rights claim accrues.  See Elliott v. City of Union City, 25 F.3d 800, 801-802 (9th Cir. 1994).  Under federal law, a claim accrues when the plaintiff knows

1  or has reason to know of the injury which is the basis of the action. <u>Kimes v. Stone</u>, 84 F.3d 1121,

2  1128 (9th Cir.1996). Because section 1983 contains no specific statute of limitations, federal courts

3  should borrow state statutes of limitations for personal injury actions in section 1983 suits. <u>See</u>

4  <u>Wilson v. Garcia</u>, 471 U.S. 261, 276 (1985); <u>Torres v. City of Santa Ana</u>, 108 F.3d 224, 226 (9th Cir.

5  1997); <u>Vaughan v. Grijalva</u>, 927 F.2d 476, 478 (9th Cir. 1991). At the time plaintiff's claims

6  accrued, the applicable statute of limitations in California for section 1983 claims was one year. Cal.

7  Civ. Proc. Code § 340(3); <u>Jones v. Blanas</u>, 393 F.3d 918, 927 (9th Cir. 2004) (Cal. Civ. Proc. §

8  335.1, extending the statute of limitations from one year to two years, does not apply to claims that

9  accrued prior to January 1, 2003). Unless the statute of limitations was tolled under California law,

10  plaintiff's suit, which was filed approximately two years after the events in question, is time barred.

11  (Doc. 1.)

12          In actions where the federal court borrows the state statute of limitations, the Court should

13  also borrow all applicable provisions for tolling the limitations period found in state law. <u>See</u> <u>Hardin</u>

14  <u>v. Straub</u>, 490 U.S. 536, 539 (1989). Pursuant to the California Code of Civil Procedure section

15  352.1, a two-year tolling period for the disability of incarceration is available to some prisoners.

16  Section 352.1 provides, in pertinent part, as follows:

17          (a) If a person entitled to bring an action, mentioned in Chapter 3 (commencing with
            Section 335), is, at the time the cause of action accrued, imprisoned on a criminal

18          charge, or in execution under the sentence of a criminal court for a term less than for
            life, the time of that disability is not a part of the time limited for the commencement

19          of the action, not to exceed two years.

20  However, because plaintiff was sentenced to prison for life without the possibility of parole,

21  California's tolling statute does not apply to plaintiff's claims in this case. (Undisputed Fact 1.)

22          "The doctrine of equitable tolling focuses on the effect of the prior claim in warning the

23  defendants in the subsequent claim of the need to prepare a defense." <u>Cervantes v. City of San</u>

24  <u>Diego</u>, 5 F.3d 1273, 1275 (9th Cir. 1993). The rules for equitable tolling are borrowed from the

25  forum state. <u>Cervantes</u>, 5 F.3d at 1275. "Under California law, a plaintiff must meet three

26  conditions to equitably toll a statute of limitations: '(1) defendant must have had timely notice of the

27  claim; (2) defendant must not be prejudiced by being required to defend the otherwise barred claim;

28  and (3) plaintiff's conduct must have been reasonable and in good faith.'" <u>Fink v. Shedler</u>, 192 F.3d

7

911, 916 (9th Cir. 1999) (quoting Bacon v. City of Los Angeles, 843 F.2d 372, 374 (9th Cir. 1988)). Under California law, the equitable tolling doctrine tolls the statute of limitations while exhaustion occurs, regardless of whether or not exhaustion is prerequisite to filing suit. Donoghue v. County of Orange, 84 F.2d 926, 930-31 (9th Cir. 1988); Addison v. State of California, 21 Cal.3d 313, 318 (1978). A plaintiff pursuing section 1983 claims may enjoy the benefit of equitable tolling while his claim is pending before the Board if the section 1983 claims and claims presented to the Board are "predicted upon the same wrong" and California's three-prong test is satisfied. Lucchesi v. Bar-O Boys Ranch, 353 F.3d 691, 696 (9th Cir. 2003). Defendants do not argue that equitable tolling does not apply while plaintiff pursued exhaustion of the administrative remedies and therefore, for the purposes of resolving this motion only, the Court shall assume that it applies.

The retaliation claims at issue in this action accrued between October 12, 2001 and December 13, 2001, when the decision was made to transfer plaintiff to another prison. (Doc. 1, Comp.) Plaintiff is proceeding on federal and state law claims. Plaintiff is required by 42 U.S.C. § 1997e(a) to exhaust his federal claims by utilizing the inmate appeals process available at the prison, and is required by the California Tort Claims Act to exhaust his state law claims by filing a claim with the Board. Cal. Gov't Code §§ 905.2, 910, 911.2, 945.4, 950-950.2 (West 2006).

Discussion of plaintiff's two inmate appeals and two Board claims becomes somewhat confusing because the first inmate appeal filed was actually exhausted after the second and later filed inmate appeal.[11] As a result, plaintiff's first Board claim relates to the second inmate appeal and the second Board claim relates to the first inmate appeal. The first inmate appeal plaintiff filed will be addressed first, along with the second Board claim which relates to that inmate appeal.

On October 29, 2001, plaintiff filed inmate appeal log number 02-1608, which grieved the conduct of defendant Busby. (Doc. 69-3, Def. Ex. G, p. 1.) Specifically, plaintiff complained that

---

[11] Plaintiff cites to four inmate appeals and two Board claims in his opposition. (Doc. 75, pgs. 9-10.) The first appeal referenced by plaintiff is irrelevant to resolution of this issue, as it is the group appeal plaintiff alleges led to the retaliatory acts against him. That appeal is relevant to plaintiff's claims for relief on the merits, but is not relevant to the application of the statute of limitations and the doctrine of equitable tolling, as the appeal was not submitted to exhaust any claims in this action and therefore has no tolling effect. Plaintiff also refers to an appeal which was an alleged re-submission of an earlier appeal. Plaintiff has not submitted any specific evidence concerning this appeal and regardless, the earlier appeal itself was ultimately exhausted and has been presented as evidence. Therefore, only two prison appeals and two Board claims are relevant to this analysis.

defendant Busby retaliated against him for filing the group appeal by confining plaintiff to quarters and threatening him with placement in administrative segregation. (Id.) The events complained of in the appeal occurred on October 12, 2001, and October 13, 2001. For reasons not evident from the record, the appeal did not receive a final decision at the Director's Level of review until January 27, 2003. (Def. Ex. L, p. 8.) Plaintiff then submitted claim number G534651 to the Board. (U.F. 6; Exhibit L, p. 5.) The claim was received on March 7, 2003, and rejected on May 23, 2003. (U.F. 7; Exhibit L, pp. 3, 9.) Plaintiff was notified of the rejection of his claim by letter dated June 6, 2003. (Id., p. 3.)

Plaintiff filed the second relevant inmate appeal, log number 02-254, on December 13, 2001, and the appeal received a final decision at the Director's Level of review on August 19, 2002. (U.F. 2, 3.) This appeal grieved plaintiff's placement in administrative segregation and pending adverse transfer, allegedly arranged in retaliation against him for filing the group appeal. After receiving the Director's Level decision, plaintiff then submitted claim number G529448 to the Board. (U.F. 4.) The claim was received on September 9, 2002, and rejected on October 25, 2002, and plaintiff was notified of the rejection of his claim by letter dated November 8, 2002. (U.F. 4, 5; Exhibit M, pp. 3, 15.)

Defendants argue that because plaintiff filed suit more than one year after the Board rejected his first claim, the claims set forth in that Board claim, which comprise the majority of plaintiff's claims according to defendants, are barred by the statute of limitations. Defendants argue that although plaintiff's second Board claim, which addressed plaintiff's claim against defendant Busby and was not exhausted until May 23, 2003, included a repetition of the claims previously raised in the first Board claim, the repetition of those already-exhausted claims did not work to equitably toll the statute of limitations a second time as to those claims.

Plaintiff argues that the statute of limitations was tolled while he exhausted all of his claims, and because he filed suit within one year of exhaustion of his second Board claim, all of his claims are timely.

The first issue is whether the subject matter of the two appeals and two claims was sufficiently interrelated that equitable tolling applied until the second and final claim was rejected

by the Board in a letter date June 6, 2003. The Court finds that it was not. The claims in this action, although all stemming from actions taken against plaintiff in alleged retaliation for the group appeal submitted by plaintiff, are separable and distinct from one another. The claims accrued on different dates and involve different defendants. The claims do not arise from an ongoing violation not amenable to separability. Although it is understandable why plaintiff would seek to include all the claims in one action, the nature of the claims is such that he was not required to do so. Therefore, the Court rejects the argument that the statute of limitations was tolled as to all of plaintiff's claims in this action until such time as he exhausted his second and final claim with the Board.

The next issue is which claims were exhausted via which inmate appeals and Board claims. Failure to exhaust the administrative remedies in compliance with 42 U.S.C. § 1997e(a) is an affirmative defense, Wyatt v. Terhune, 315 F.3d 1108, 1119 (9th Cir. 2003), and defendants did not move to dismiss any of plaintiff's claim for failure to exhaust. The Court is neither making a finding nor expressing an opinion as to which of plaintiff's claims were or were not exhausted in compliance with section 1997e(a), but is merely making a record of what was grieved in each inmate appeal and each Board claim in order to determine which claims in this action were subject to equitable tolling of the statute of limitations and during which periods of time.

Plaintiff's first inmate appeal grieved his claim that defendant Busby confined him to quarters and threatened to place him in administrative segregation in retaliation for filing the group appeal. The subsequent Board claim, which was the second Board claim due to the length of time taken by prison officials to consider the appeal, grieved plaintiff's claims that defendant Busby confined him to quarters and threatened to place him in administrative segregation in retaliation for filing the group appeal, and that defendant Chatham terminated him from his MAC position. The second Board claim also set forth allegations relating to plaintiff's placement in administrative segregation and transfer. Plaintiff's second inmate appeal grieved his placement in administrative segregation and the decision to transfer him, actions which relate to plaintiff's claims against defendants Ortiz and Stockman. The subsequently filed Board claim, which was the first Board claim, grieved plaintiff's placement in administrative segregation and the decision to transfer him.

///

1  As such, plaintiff raised the issue of his placement in administrative segregation and transfer in both

2  Board claims.

3      Plaintiff may not effectively evade the statute of limitations by relying on the submission of

4  duplicate claims to the Board.[12]  Plaintiff's claims concerning his placement in administrative

5  segregation and adverse transfer, raised in inmate appeal number 02-254 and Board claim number

6  G529448, were exhausted first.  The statute of limitations was tolled during the exhaustion process.

7  Once the Board claim was exhausted, the equitable tolling of the statute of limitations afforded

8  plaintiff during the pendency of exhaustion proceedings concluded and the one-year statute of

9  limitations began to run as to the claims raised in that Board claim.  Plaintiff thereafter received a

10 Director's Level decision on his inmate appeal against the actions of defendant Busby and submitted

11 a claim to the Board (appeal number 02-1608 and Board claim number G534651).  That plaintiff

12 chose in his second Board claim to reiterate some of the allegations already presented to and rejected

13 by the Board does not work equitably toll the statute of limitations a second time as those allegations.

14 Exhaustion occurred and plaintiff became entitled to file suit concerning his placement in

15 administrative segregation and adverse transfer when the Board rejected his first Board claim and

16 notified him by letter of its action.

17     The Court next turns to when the statute of limitations ran on plaintiff's claims concerning

18 his placement in administrative segregation and transfer.  Although defendants argue in their motion

19 that exhaustion occurred on October 25, 2002, when plaintiff's Board claim was rejected during a

20 meeting, defendants have set forth no authority for this position.  The Court finds that exhaustion

21 occurred not when the Board rejected plaintiff's claim during a meeting on October 25, 2002, but

22 when the Board issued its written rejection in a letter dated November 8, 2002.  County of Los

23 Angeles v. Superior Court, 26 Cal.Rptr. 3d 445, 448 (Cal. Ct.App. 2005) ("A[n] action against a

24 public entity on a cause of action for which a claim must be presented must be commenced 'not later

25 than six months' after written notice rejecting the claim is delivered to the claimant personally or

26

27        [12] Plaintiff is proceeding pro se and the Court is not suggesting that plaintiff was intentionally trying to
   evade the statute of limitations by including in his second Board claim claims already raised and rejected by the
28 Board.  It is unclear from the record why plaintiff raised duplicative claims before the Board.

11

deposited in the mail." (citing to Cal. Gov't Code § 945.6)).  Review of the rejection letter itself is in accordance with this position, as the letter states in relevant part, "Subject to certain exceptions, you have only six months from the date *this notice* was personally delivered or deposited in the mail to file a court action on this claim."  (Def. Ex. M, p. 3 (emphasis added).)  Thus, the statute of limitations began to run when the rejection letter was mailed to plaintiff, and plaintiff had six months from November 8, 2002, within which to file suit on his state law claims and one year from November 8, 2002, within which to file suit on his federal claims.

The parties do not dispute that plaintiff filed this suit on November 10, 2003. (Doc. 1; Doc. 69-1, p. 2 ln. 18; Doc. 75, Opp., p. 9.)  Accordingly, based on the evidence and arguments presented to the Court,  plaintiff's claims stemming from his placement in administrative segregation and adverse transfer are time barred because they were not filed prior to the expiration of the statute of limitations on November 8, 2003.  As a result of the dismissal of these claims, there are no further claims pending against defendants Ortiz and Stockman.  However, the claims in this action against defendants Busby and Chatham stemming from plaintiff's confinement to quarters and termination from the MAC are not barred by the statute of limitations, as suit was filed less than six months after exhaustion of the Board claim relating to those claims occurred on June 6, 2003.

        2.    <u>Retaliation Claims</u>

        a)    <u>Allegations Set Forth in Complaint</u>

In his complaint, plaintiff alleges that in his capacity as the Executive Chairman for MAC, he authored and submitted a group appeal on October 5, 2001.  (Doc. 1, Comp., pg. 4.)  Plaintiff alleges that on October 12, 2001, defendant Busby attempted to get him to drop the group appeal and when he refused, defendant threatened to place him in administrative segregation and confined him to quarters (CTQ status). (<u>Id</u>., pgs. 4-5.) Plaintiff alleges that on October 13, 2001, defendant Busby again threatened plaintiff with placement in administrative segregation, told plaintiff that some other inmates felt misled by the group appeal, and asked plaintiff if he wanted to be locked up in administrative segregation.  (<u>Id</u>., pgs. 5-6.)  Plaintiff alleges that he recognized this to be a scheme by defendant to have plaintiff remove himself from the general population and thereby manipulate a lock-up order without supporting documentation.  (<u>Id</u>., pg. 6.)

12

1    Plaintiff alleges that on October 16, 2001, defendant Chatham removed him from CTQ status

2    because it was inappropriate and told him that the 128-B chrono authored by defendant Busby would

3    be removed from his file. (Id., pg. 7.) Plaintiff alleges that on October 17, 2001, defendant Chatham

4    issued a new 128-B chrono and angrily informed plaintiff he was suspended from all MAC business

5    and duties, and his job assignment pending the outcome of an investigation into the group appeal

6    issue. (Id.) Plaintiff alleges that defendant Chatham told him not to interfere in the investigation

7    or he would be placed in administrative segregation. (Id.) Plaintiff alleges that the new 128-B

8    chrono falsely stated plaintiff was a threat to the safety and security of the institution and was

9    coercing and/or threatening other inmates. (Id., pg. 8.)

10                   b)      Legal Standard for Retaliation Claims

11    An allegation of retaliation against a prisoner's First Amendment right to file a prison

12    grievance is sufficient to support claim under section 1983. Bruce v. Ylst, 351 F.3d 1283, 1288 (9th

13    Cir. 2003). "Within the prison context, a viable claim of First Amendment retaliation entails five

14    basic elements:  (1) An assertion that a state actor took some adverse action against an inmate (2)

15    because of (3) that prisoner's protected conduct, and that such action (4) chilled the inmate's exercise

16    of his First Amendment rights, and (5) the action did not reasonably advance a legitimate

17    correctional goal." Rhodes v. Robinson, 408 F.3d 559, 567-68 (9th Cir. 2005). Courts must "'afford

18    appropriate deference and flexibility' to prison officials in the evaluation of proffered legitimate

19    penological reasons for conduct alleged to be retaliatory." Pratt v. Rowland, 65 F.3d 802, 807 (9th

20    Cir. 1995) (quoting Sandin v. Conner, 515 U.S. 472, 482 (1995)). The burden is on the prisoner to

21    demonstrate "that there were no legitimate correctional purposes motivating the actions he complains

22    of." Pratt, 65 F.3d at 808.

23                   c)      Claim Against Defendant Busby

24    In 2001, plaintiff was the chairman of MAC, which is an organization whose purpose is to

25    act as a liaison for inmates and institutional administration. (U.F. 8, 9.)  When inmates want a

26    program or policy that will help them, the MAC council will present the idea and lobby for its

27    implementation, and when the institution wants to institute a new policy that will require inmate

28    ///

1  cooperation, staff members express the plan to MAC members and request the MAC representatives

2  communicate the policies to the inmate population.  (U.F. 9.)

3      On October 5, 2001, plaintiff submitted a group appeal complaining that staff members were

4  too busy having potlucks and kicking back to release inmates for yard time.  (U.F. 14, 15.)  The

5  appeal was accompanied by approximately four-hundred inmate signatures from three buildings.

6  (U.F. 17.)  Although the appeal had been prepared by plaintiff, the task of collecting signatures had

7  been delegated by plaintiff to the MAC building representatives.  (U.F. 16.)

8      Defendants' position is that the group appeal was assigned to defendant Busby for review,

9  investigation, and an initial response, and defendant Busby began investigating the appeal by

10  questioning some of the inmates who signed the appeal.   (Doc. 69-4, Busby Dec., ¶¶2-3.)

11  Defendants contend that defendant Busby learned some inmates were misinformed of the contents

12  of the appeal, approximately ten inmates felt coerced into signing the appeal, and approximately ten

13  other inmates had not seen the entire appeal.  (Id., ¶¶4-6.)  Defendants contend that some of the

14  inmates who wanted their names removed from the group appeal signed paperwork explaining their

15  positions via a CDC 128-B form.  (Id., ¶6.)  Defendants contend that based on this information,

16  defendant Busby determined plaintiff's actions needed to be investigated to determine whether

17  plaintiff, the MAC representatives, or inmates who did not sign the appeal were in danger. (Id., ¶8.)

18  Defendants contend that defendant Busby issued a 128-B chrono confining plaintiff to quarters on

19  October 12, 2001, in order to isolate him from other inmates during the investigation, based on

20  defendant Busby's concern that plaintiff would discuss the facts of the appeal and the signatures with

21  the MAC representatives and the signing inmates.  (Id., ¶¶9-10.)  Defendant Busby argues that he

22  confined plaintiff to quarters because plaintiff was "instigating danger for other inmates and

23  himself," and that he did not act with retaliatory intent.  (Doc. 69-1, 10:22-23.)

24      Before reaching plaintiff's opposition, the Court shall address defendants' reply concerning

25  plaintiff's evidence.  Defendants' objection that plaintiff has not submitted *any* admissible evidence

26  to controvert the undisputed facts and their version of events is without merit.  Plaintiff's verified

27  complaint and opposition constitute opposing affidavits for purposes of summary judgment rule, to

28  the extent they are based on personal knowledge of specific facts which are admissible in evidence.

1    Moran v. Selig, 447 F.3d 948, 759-60 (9th Cir. 2006); Jones v. Blanas, 393 F.3d 918, 923 (9th Cir.

2    2004); Johnson v. Meltzer, 134 F.3d 1393, 1399-1400 (9th Cir. 1998).   In addition, plaintiff has

3    submitted the declarations of witnesses.   Declarations or affidavits, both party and non-party, must

4    be based on personal knowledge of admissible facts, and may not be based merely on opinion or

5    belief.  McElyea v. Babbitt, 833 F.2d 196, 197-98 (9th Cir. 1987) (per curium); Lew v. Kona Hosp.,

6    754 F.2d 1420, 1423 (9th Cir. 1985).  "[P]ersonal knowledge and competence to testify . . . may be

7    inferred from the affidavits themselves."  Barthelemy v. Air Line Pilots Ass'n, 897 F.2d 999, 1018

8    (9th Cir. 1990).

9           Defendants object to statements attributed to defendant Busby as inadmissible hearsay.

10   "'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or

11   hearing, offered in evidence to prove the truth of the matter asserted."  Fed. R. Evid. 801(c)

12   Statements offered for reasons other than to prove the truth of the matter asserted are not hearsay,

13   and a party's own statements offered against him are not hearsay.   Fed. R. Evid. 801(d)(2).

14   Defendant Busby's statements are admissions and are attested to in the declarations of eye and ear

15   witnesses to the statements.  Accordingly, defendants' hearsay objections as they relate to defendant

16   Busby's statements offered against him are overruled.

17          The Court declines to expend its resources issuing line by line rulings concerning the

18   declarations submitted by plaintiff.  The parties are on notice that the rules and principles set forth

19   in these paragraphs, as well as any additional applicable rules, are used by the Court in deciding

20   which of the declarants' statements are and are not admissible.

21          Plaintiff's position is that on October 12, 2001, he was confined to quarters by defendant

22   Busby for soliciting inmate signatures for the group appeal under false pretenses, an accusation

23   plaintiff contends was false.  (Doc. 74, Ross Dec., ¶6.)  Thereafter, on October 17, 2001, plaintiff

24   was terminated from his paying job by defendant Chatham for using intimidation and coercion to

25   obtain inmate signatures, presenting a threat to the safety of others, and being counter-productive to

26   the best interest and welfare of the inmate population, accusations plaintiff contends are false.  (Id.,

27   ¶7.)

28   ///

1    Plaintiff contends that prior to October 5, 2001, he and other MAC members were

2    approached by some of the prisoners in general population who were upset that their program

3    activities were regularly being suspended by correctional staff members.  (Doc. 75, Opp., p. 13.)

4    Plaintiff contends that he and inmate Hebbe, MAC Vice-Chairman, were monitoring the suspension

5    of programs and maintaining a daily log due to complaints they received.  (Id.)  Plaintiff and inmate

6    Hebbe subsequently drafted a group inmate appeal and during a council meeting, distributed an

7    identical copy to each MAC representative to gather signatures.  (Id., p. 14.)

8    Inmate witness Lavell Player attests that on or around October 3, 2001, in his capacity as a

9    MAC representative, he passed around the group appeal authored by plaintiff and inmate Hebbe

10   grieving delayed and/or suspended yard activities.  (Doc. 81, Player Dec., ¶¶4-5.)  The appeal was

11   comprised of two pages of text and five signature pages.  (Id., ¶6.)  All inmates who signed Player's

12   copy of the appeal were given the opportunity to read the appeal and could choose not to sign the

13   appeal.  (Id., ¶7.)  Player did not pressure the inmates to sign the appeal or use duress, threats,

14   coercion, or trickery to get the inmates to sign the appeal.  (Id., ¶8, 10.)  Neither plaintiff nor Hebbe,

15   or any other MAC member, was present when Player was obtaining signatures, and it was Player's

16   duty to advise the inmates in his unit what the appeal concerned.  (Id., ¶9.)  Of the inmates who

17   signed the appeal, some read the entire appeal, some read only parts of it, some skimmed the first

18   page only, and some questioned Player about the contents.  (Id., ¶11.)

19   Inmate Gerald Wilson attests that in October of 2001, he was a MAC representative and that

20   based on complaints from the inmate population, MAC council members agreed during a meeting

21   to a group appeal concerning the suspension of inmate programs such as dayroom and yard.  (Doc.

22   81, Wilson Dec., ¶¶2, 3, 6, 7, 8.)  Housing unit representatives were designated to obtain as many

23   signature as possible from their housing units.  (Id., ¶10.)  Wilson and inmate Castro gathered

24   signatures in housing unit 3A02 in their capacities as MAC representatives.  (Id., ¶11.)  Neither

25   plaintiff nor other executive body members of MAC participated in the gathering of signatures, and

26   Wilson did not use coercion, threats, or duress to gather signatures.  (Id., ¶12.)  The inmates who

27   signed the appeal appeared to do so willingly after reading the appeal or discussing the appeal with

28   Wilson and Castro.  (Id., ¶13.)

On October 5, 2001, plaintiff submitted the group appeal. (U.F. 14.) On October 12, 2001, plaintiff was summoned to the program office. (Comp., pg. 4.) Plaintiff contends that present were defendant Busby, Officers J. C. Garcia, R. Ortiz, and R. Juarez, and an unknown officer, and that defendant Busby expressed displeasure about the contents of the appeal and said that he should place plaintiff in administrative segregation because he believed the signatures were obtained under false pretenses. (Id.) Plaintiff contends he said he had nothing to do with obtaining the signatures and it was the duty of MAC representatives. (Id., pgs. 4-5.) Plaintiff contends defendant Busby then asked plaintiff if he was going to drop the appeal because Busby disagreed with the part of the appeal stating "staff's time was being occupied with potlucks and kicking back relaxing for an easy day of pay." (Id., p. 5; Doc. 69-3, Def. Ex. C .) Plaintiff contends that when he declined to drop the appeal, defendant Busby was upset by his response and issued a 128-B chrono confining plaintiff to quarters. (Id., pg. 5.)

Plaintiff contends that on October 13, 2001, he was escorted back to the program office, where defendant Busby again threatened that he should place plaintiff in administrative segregation because he felt plaintiff's life might be in danger. (Id.) Plaintiff contends that defendant Busby said he personally received information that a few inmates felt misled by the appeal and that the inmates had signed 128-B chronos against plaintiff. (Id.) Plaintiff contends that defendant Busby asked plaintiff if he wanted to be locked up for his own safety and protection, but plaintiff declined. (Id., p. 6.) Plaintiff contends that there were no Rules Violation Reports issued against plaintiff concerning this matter because no infractions occurred, and that the group appeal was subsequently granted. (Id., pg. 6; Doc. 75, pg. 16; Doc. 69-3, Def. Ex. C.)

Plaintiff contends that on or around October 12, 2001, inmates John Doss and Maurice Alston signed 128-B chronos prepared by defendant Busby concerning the group appeal, after being requested to do so by defendant Busby. (Doc. 81, Doss Dec., ¶7; Doc. 81, Alston Dec., ¶7.) Turning first to the evidence provided by inmate Doss, prior to signing the 128-B chrono, inmate Doss read the group appeal, agreed with its content, and signed it on or around October 3, 2001. (Doss Dec., ¶4.) Plaintiff was not present at the time, and Doss was not threatened, coerced, or placed under duress when he signed the appeal. (Id.)

On or around October 12, 2001, Doss was summoned to the program office and reported to defendant Busby. (Id., ¶5.) J. C. Garcia, R. Ortiz, R. Juarez, and Garnica were also present. (Id.) Doss asked, "'What's up?'" and defendant Busby stated to Doss, "'I thought we were cool with each other.'" (Id., ¶¶5- 6.) Doss stated, "'We are cool, what's going on?'" (Id., ¶6.) Defendant Busby pointed to a 602 inmate appeal on his desk and said, "'This is how you do me.'" (Id.)   Doss inquired what it was and defendant Busby said, "You tell me, it has your signature on it.'" (Id.) Defendant Busby then asked, "'Did you sign this appeal against me?'" (Id.) Doss said, "'No, it's not on you, it's on the lack of the yard program that stops all the time.'" (Id.) "Busby [then] turned to a second page and questioned a part about pot-luck and officers being lazy." (Id., ¶7.) Doss told defendant Busby that he did not "recall seeing that part when [he] signed that appeal." (Id.) Defendant Busby stated to Doss that Doss may have been misled by plaintiff adding a second page if Doss did not see the second page. (Id.) Defendant Busby asked defendant Doss to sign a 128-B chrono. (Id.) Doss complied and crossed his name out on the group appeal, stating that he did not know about the second page. (Id.) Defendant Busby asked Doss if he knew plaintiff and when Doss said they knew each other well and were friends, defendant Busby stated, "It looks like your friend did you, what kind of friend is that." (Id., ¶8.) At that point, Doss felt somewhat disrespected and let down by plaintiff. (Id.)

On October 14, 2001, inmate Alston asked Doss if defendant Busby had Doss sign a 128-B chrono. (Id., ¶9.) When Doss confirmed he had, Alston told Doss he should get it back and tear it up because Busby was using them to get evidence against plaintiff. (Id.) Doss did not believe the situation was all that serious and refused to get the chrono back because he did not want Busby upset with him. (Id., ¶10.) At point, Doss and Busby "were cool." (Id.)

Between October 14, 2001, and October 16, 2001, Doss became concerned because rumors were circulating around the inmate population that he was "working for the police (Busby)." (Id., ¶11.) On or around October 16, 2001, Doss went to the program office because he was upset and "got at [defendant] Busby in an emotional state" because he felt he had been unnecessarily placed in a bad position with the general population by Busby. (Id., ¶¶12, 14.) Doss requested the 128-B chrono he signed back. Defendant Busby appeared upset and said, "'[I]t's too late now, don't worry

1  about it.'" (Id., ¶14.) Doss then left the program office. (Id.) Approximately five to ten minutes

2  later, Doss heard plaintiff summoned to the program office. (Id., ¶15.)

3      Turning to inmate Alston's declaration, Alston read the group appeal and agreed to sign it

4  without duress, threats, or coercion. (Alston Dec., ¶4.) On or around October 12, 2001, Alston was

5  summoned to the program office by defendant Busby. (Id., ¶5.) Defendant Busby asked why Alston

6  signed the group appeal against him. (Id., ¶6.) Alston stated the appeal "was not against [Busby]

7  personally but [was] against the inconsistencies of the daily program activities." (Id.) Busby stated

8  that "he's in charge of the daily programs, which means the appeal is against him an[d] that's

9  personal." (Id.) During the exchange, Alston was surrounded in the small office by Officers J. C.

10  Garcia, R. Ortiz, and R. Juarez. (Id., ¶6.)

11      Alston was asked to sign a CDC-128-B informational chrono already prepared by defendant

12  Busby concerning information not attached to and not included in the group appeal at the time of

13  signature. (Id., ¶7.) Alston signed the chrono. (Id.) After further discussion between them, Alston

14  came to believe that he was being pitted against plaintiff and used to build a case against plaintiff

15  for retaliatory reasons, so he grabbed and tore up the chrono he had just signed. (Id., ¶¶9-10.)

16      Plaintiff may not defeat defendant's motion for summary adjudication by tendering his own

17  opinion and the opinions of his inmate witnesses that defendant set him up and retaliated against him

18  because he filed the group appeal. These are opinions rather than facts and are inadmissible.

19  However, viewing the evidence in the light most favorable to plaintiff and drawing all justifiable

20  inferences in plaintiff's favor, Eastman Kodak Co. v. Image Technical Servs., Inc., 504 U.S. 451,

21  456 (1992); Anderson, 477 U.S. at 255, plaintiff has submitted evidence sufficient to give rise to

22  factual disputes over the basis for plaintiff's confinement to quarters. Prison officials unquestionably

23  have a legitimate penological interest in preserving the safety and security of the institution, which

24  includes protecting plaintiff, other inmates, and staff. The curtailment of activities and privileges

25  is sometimes required to effect this interest. If it was undisputed that defendant Busby confined

26  plaintiff to quarters because of a concern for the safety and security of the institution as a result of

27  issues stemming from the preparation and submission of the group appeal, defendant would be

28  entitled to judgment as a matter of law, even if defendant's concerns were unfounded and regardless

of any unfairness by perceived by plaintiff.  Deference is to be accorded the penological interest proffered by prison officials to explain their actions.  Pratt, 65 F.3d at 807.  However, in this instance there are disputes of material fact between the parties concerning whether defendant Busby's action was in fact motivated by the advancement of a legitimate penological interest in institutional safety and security, or was instead taken in retaliation against plaintiff because of the group appeal plaintiff drafted and submitted.

Plaintiff has submitted evidence that he was not present during the collection of signatures and was not involved with gathering signatures for the group appeal, but was summoned to defendant Busby's office after the appeal was filed and, in the presence of other staff members, was questioned about dropping the appeal because defendant Busby did not like the part of the appeal stating that staff were too busy engaging in pot lucks and kicking back.  When plaintiff declined to drop the appeal, defendant Busby became upset and confined him to quarters.  Plaintiff has also submitted evidence that the two inmates who signed 128-B chronos pre-prepared by defendant Busby concerning the group appeal did so after being summoned to the program office and questioned by defendant Busby, in the presence of other officers, regarding their participation in the group appeal.  Prior to asking them to sign the chronos, defendant Busby made statements indicating that he was displeased about the appeal, and felt it was personal and taken against him.  Plaintiff has submitted evidence that after Doss signed the chrono, defendant Busby made negative statements to Doss about plaintiff and his friendship with Doss, and that Doss felt disrespected and let down by plaintiff only after he signed the chrono and after defendant Busby made those negative comments.  Finally, plaintiff has submitted evidence that shortly after signing the 128-B chrono, Alston ripped it up, and Doss attempted to retrieve the 128-B chrono he signed a number of days later but defendant Busby became upset and told Doss that it was too late.

Although defendant contends he was legitimately concerned due to unhappiness expressed to him by some of the inmates who signed the group appeal, a reasonable trier of fact could conclude from plaintiff's evidence that defendant became unhappy with the contents of the appeal drafted and filed by plaintiff, confined plaintiff to quarters when plaintiff refused to drop the appeal, and, using pressure and/or manipulative tactics against Doss and Alston, orchestrated the alleged underlying

dissension concerning the appeal in an effort to establish a reason to support his confinement of plaintiff to quarters, a confinement which was lifted several days later by defendant Chatham because it was "inappropriate." (Doc. 1, Comp., 7:4-5.) Because disputed issues of fact exist between the parties concerning defendant Busby's motive for confining plaintiff to quarters, defendant Busby is not entitled to summary adjudication on plaintiff's retaliation claim against him.

### d.   Claim Against Defendant Chatham

Plaintiff's claim against defendant Chatham arises from the incident on October 17, 2001, in which defendant Chatham suspended plaintiff from MAC and issued a CDC-128-B chrono stating that "[p]laintiff was a threat to the safety and security of the institution and was coercing and/or threatening other inmates." (Comp., 7:21-8:9.) On October 16, 2001, defendant Busby informed defendant Chatham of his preliminary discoveries concerning the group appeal and on October 17, 2001, defendant Chatham suspended plaintiff from his duties as a MAC chairman and issued a 128-B chrono explaining the reasons for the suspension. (U.F. 19, 20.) Defendants contend that defendant Chatham informed plaintiff the suspension was temporary and he would be permitted to rejoin MAC in his former capacity if the situation could be diffused. (Doc. 69-3, Chatham Dec., ¶9.) Defendant Chatham released plaintiff from CTQ status, and warned plaintiff that he could remain in general population and free of administrative segregation as long as he did not jeopardize the investigation. (U.F. 22, 23.) Defendant Chatham argues that he suspended plaintiff from MAC duties temporarily "because he had reliable information that inmates in the general population were angry with plaintiff for his actions and as a member of MAC," and he concluded that it would be "safer for plaintiff and the MAC representatives if plaintiff pas not involved with the MAC until the accusations were resolved." (Doc. 69-1, 11:16-20.)

In order to raise a triable issue of fact as to his claim against defendant Chatham, plaintiff must submit some evidence that defendant Chatham took the actions he did in retaliation against plaintiff because of the group appeal submitted by plaintiff. It is not enough that plaintiff submitted evidence bringing into question defendant Busby's motivation for initiating the investigation, which was the first act in the chain of events, and it is not enough for plaintiff to argue that defendant Chatham's concerns were unfounded because plaintiff did not do anything wrong. At issue is

1  defendant's Chatham's motivation.  Plaintiff must submit evidence that defendant Chatham was

2  motivated by retaliation and not by the advancement of any legitimate penological interest.

3      Although plaintiff contends that defendant Chatham contradicted himself first by denying

4  knowledge of plaintiff's placement on CTQ status by defendant Busby and denying he removed

5  plaintiff from CTQ status, and then by attesting that defendant Busby placed plaintiff on CTQ status

6  pending investigation, plaintiff misstates that evidence.  (Doc. 75, pp. 22-23; Doc. 75, P's Ex. E, 1:3-

7  12; Doc. 69, Chatham Dec., ¶8.)  In plaintiff's requests for admission, plaintiff asked defendant

8  Chatham to admit that he knew defendant Busby *inappropriately* placed plaintiff on CTQ status and

9  that defendant Chatham took plaintiff off of CTQ status *in view of that*.  Defendant Chatham denied

10  both requests for admission.  The denials of these requests as phrased by plaintiff do not contradict

11  defendant Chatham's statement in his declaration that defendant Busby informed him that Busby felt

12  further investigation was needed.  Although plaintiff has evidence, in the form of an admission set

13  forth in his complaint, that defendant Chatham released plaintiff from CTQ status because it was

14  inappropriate, this evidence does not assist plaintiff is supporting his claim that when defendant

15  Chatham subsequently terminated plaintiff from MAC and issued a 128-B, defendant Chatham's

16  motive was retaliatory in nature.

17      Defendant Chatham has submitted evidence that on October 16, 2001, he was informed by

18  defendant Busby that other inmates had claimed plaintiff intimidated and coerced them into signing

19  the group appeal, that defendant Chatham determined the information received warranted an

20  investigation into plaintiff's actions, and that defendant Chatham suspended plaintiff from MAC on

21  October 17, 2001, pending investigation.  Plaintiff makes much of the various language choices

22  made by defendants.  (See e.g., Doc. 75, pp.23-24.)  Plaintiff's focus on whether defendants were

23  investigating the group appeal versus investigating the method of signature collection, and whether

24  defendants could have properly been conducting an investigation prior to the formal assignment of

25  appeal for review does not assist plaintiff in this instance.

26      Actions which negatively affect plaintiff are actionable in this suit only if they were

27  motivated in retaliation against plaintiff for the exercise of his First Amendment rights.  Actions

28  which negatively affect plaintiff are not actionable if they result from the advancement of a

22

legitimate penological goal. Investigations, formal or informal, by staff into any concerns they believe may affect the safety and security of the institution constitute a legitimate penological goal, even if their concerns prove to be unfounded or if their concerns result from mistaken beliefs or erroneous information. The submission of an inmate appeal is not shielded from any and all scrutiny such that any and all actions taken by prison officials concerning the appeal expose them to liability for retaliation. Rather, the Constitution is concerned with adverse action taken against a prisoner in retaliation for the exercise of his First Amendment rights. Plaintiff may not prevail on a retaliation claim merely because he filed an inmate appeal and was inconvenienced or otherwise subject to restrictions. Plaintiff bears the burden of demonstrating that there could have been no legitimate penological purpose behind the adverse actions complained of and deference must be given to prison officials' explanation. Pratt, 65 F.3d at 807-08.

In this instance, regardless of whether the inmate appeal had not yet been officially assigned for response or how formal or informal the investigation may have been, defendant Chatham has presented evidence that he took the actions he did because he was notified by defendant Busby of concerns stemming from the preparation of the appeal. Assuming that defendant Busby retaliated against plaintiff and was responsible for intentionally creating the underlying tension and concerns which Busby would later use to justify his action and which he would relay to defendant Chatham, the adverse action taken by Chatham was not in violation of plaintiff's constitutional rights unless Chatham either knew of Busby's misconduct and knowingly joined in the chain of retaliatory acts or was independently motivated to retaliate against plaintiff because of the group appeal. Plaintiff may not defeat Chatham's motion for summary adjudication by concluding that because he filed a group appeal and because he was negatively affected by defendant Chatham's actions, defendant Chatham retaliated against him. Defendant Chatham has presented evidence that his actions advanced a legitimate penological goal. Plaintiff has not submitted evidence that defendant Chatham's actions were unmotivated by any legitimate correctional purposes and were instead motivated by the desire to retaliate against plaintiff. Accordingly, defendant Chatham is entitled to summary adjudication on plaintiff's retaliation claim against him.

///

1          3.     Qualified Immunity

2          Defendants argue that they are entitled to qualified immunity.  Because the Court found that

3   defendants Ortiz and Stockman are entitled to dismissal of the claims against them, and defendant

4   Chatham is entitled to judgment as a matter of law on the retaliation claim against him, the Court

5   addresses only the remaining retaliation claim against defendant Busby.

6          Government officials enjoy qualified immunity from civil damages unless their conduct

7   violates "clearly established statutory or constitutional rights of which a reasonable person would

8   have known."  Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).  Qualified immunity protects "all but

9   the plainly incompetent or those who knowingly violate the law."  Malley v. Briggs, 475 U.S. 335,

10  341 (1986).  In ruling upon the issue of qualified immunity, the initial inquiry is whether, taken in

11  the light most favorable to the party asserting the injury, the facts alleged show the defendant's

12  conduct violated a constitutional right.  Saucier v. Katz, 533 U.S. 194, 201 (2001).  If, and only if,

13  a violation can be made out, the next step is to ask whether the right was clearly established.  Id.  The

14  inquiry "must be undertaken in light of the specific context of the case, not as a broad general

15  proposition . . . ."  Id.  "[T]he right the official is alleged to have violated must have been 'clearly

16  established' in a more particularized, and hence more relevant, sense:  The contours of the right must

17  be sufficiently clear that a reasonable official would understand that what he is doing violates that

18  right."  Id. at 202 (citation omitted).  In resolving these issues, the Court must view the evidence in

19  the light most favorable to plaintiff and resolve all material factual disputes in favor of plaintiff.

20  Martinez v. Stanford, 323 F.3d 1178, 1184 (9th Cir. 2003).

21         Plaintiff alleges that defendant Busby confined him to quarters because defendant Busby was

22  displeased that plaintiff drafted and submitted an inmate appeal which was critical of staff, and that

23  defendant's actions did not advance any legitimate penological purpose.  In this Circuit, prisoners

24  have a First Amendment right to submit prison grievances and prison officials may not take adverse

25  action taken against prisoners because of the exercise of this right.  Bruce, 351 F.3d at 1288; Austin

26  v. Terhune, 367 F.3d 1167, 1170-71 (9th Cir. 2004).  Viewing the allegations in the light most

27  favorable to plaintiff, the allegations are sufficient to show that defendant's conduct violated

28  ///

1  plaintiff's right to be free from retaliation, and the first prong of the qualified immunity inquiry set

2  forth in Saucier has therefore been met.  Saucier, 533 U.S. at 201.

3  Turning to the second prong, the Court must determine whether the right was clearly

4  established.  Id.  Despite defendant's assertion to the contrary, by 2001 "the prohibition against

5  retaliatory punishment [was] clearly established law in the Ninth Circuit, for qualified immunity

6  purposes." Hydrick v. Hunter, 449 F.3d 978, 994 (9th Cir. 2006) (citing Pratt v. Rowland, 65 F.3d

7  802, 806 & n. 4 (9th Cir. 1995) (inmate alleged that he was transferred to a different prison and

8  double-celled in retaliation for exercising his First Amendment rights)) (internal quotation marks

9  omitted); Rhodes v. Robinson, 380 F.3d 1123, 1132 (9th Cir. 2004); see also Hines v. Gomez, 108

10  F.3d 265, 267(9th Cir. 1997) (guards found guilty of charging inmate with a false rules violation and

11  finding him guilty in retaliation for inmate's prior use of the grievance system); Valandingham v.

12  Bojorquez, 866 F.2d 1135, 1138 (9th Cir. 1989) (inmate alleged that officers labeled him a snitch

13  for petitioning prison and government officials for redress and that, because of this labeling, the

14  inmate was approached by other inmates and threatened with harm); Rizzo v. Dawson, 778 F.2d 527,

15  530-32 (9th Cir. 1985) (inmate alleged that he was reassigned out of a vocational class and

16  transferred to a different prison because of his activities as a jailhouse lawyer).

17  Defendant correctly argues that the existence of triable issues of fact does not necessarily

18  defeat his claim of qualified immunity.  The Court "must look at the situation as a reasonable officer

19  in [Busby's] position could have perceived it."  Marquez v. Gutierrez, 322 F.3d 689, 693 (9th Cir.

20  2003).  If it would be clear to a reasonable officer in Busby's position that his conduct was unlawful

21  in the circumstance confronted by him, Busby is not entitled to qualified immunity.  Estate of Ford

22  v. Ramirez-Palmer, 301 F.3d 1043, 1051 (9th Cir. 2002).  As previously stated, the Court must view

23  the evidence in the light most favorable to plaintiff and resolve all material factual disputes in favor

24  of plaintiff.  Martinez, 323 F.3d at 1184.

25  Defendant argues that he "received credible information that some of the inmates on A-Yard

26  were angry with Plaintiff for his actions in gathering signatures for the group appeal," and

27  "[t]herefore, a reasonable prison official could have concluded that removing Plaintiff from the yard

28  while the investigation was occurring . . . did not violate Plaintiff's First Amendment rights, but

1   rather . . . was necessary to ensure Plaintiff's safety." (Doc. 69-1, 15:1-6.) Plaintiff, on the other

2   hand, has submitted evidence that defendant Busby was motivated not out of concern for plaintiff's

3   safety following receipt of credible information but was instead motivated to retaliate against

4   plaintiff out of anger over the contents of the appeal plaintiff drafted and submitted, and that

5   defendant Busby worked to create or manufacture safety concerns in order to have a stated

6   justification for the adverse actions taken against plaintiff.

7        Viewing the evidence in the light most favorable to plaintiff, the contours of plaintiff's right

8   to be free from adverse action against him taken in retaliation for filing a prison grievance were

9   sufficiently clear that a reasonable officer would understand that his actions were unlawful in the

10  situation confronted. Saucier, 533 U.S. at 202. Accordingly, the Court finds that defendant Busby

11  is not entitled to qualified immunity on plaintiff's retaliation claim against him.

12                           4.      State Law Negligence Claims

13       In their motion, defendants argue that if the Court grants summary judgment on plaintiff's

14  federal claims, it should dismiss all the remaining state law claims. Pursuant to 28 U.S.C. § 1367(a),

15  in any civil action in which the district court has original jurisdiction, the district court "shall have

16  supplemental jurisdiction over all other claims in the action within such original jurisdiction that they

17  form part of the same case or controversy under Article III," except as provided in subsections (b)

18  and (c). "[O]nce judicial power exists under § 1367(a), retention of supplemental jurisdiction over

19  state law claims under 1367(c) is discretionary." Acri v. Varian Assoc., Inc., 114 F.3d 999, 1000

20  (9th Cir. 1997). "The district court may decline to exercise supplemental jurisdiction over a claim

21  under subsection (a) if . . . the district court has dismissed all claims over which it has original

22  jurisdiction." 28 U.S.C. § 1367(c)(3). The Supreme Court has cautioned that "if the federal claims

23  are dismissed before trial, . . . the state claims should be dismissed as well." United Mine Workers

24  of America v. Gibbs, 383 U.S. 715, 726 (1966).

25       As set forth herein, plaintiff's federal claim for retaliation against defendant Busby survives

26  defendants' motion for summary judgment. Accordingly, defendants' motion to dismiss plaintiff's

27  negligence claims against defendants Busby and Chatham is denied.

28  ///

E.    Conclusion

Based on the foregoing, it is HEREBY ORDERED that defendants' motion for summary judgment, filed October 13, 2005, is GRANTED IN PART and DENIED IN PART as follows:

1.    Defendants' motion to dismiss plaintiff's claims stemming from his placement in administrative segregation and transfer to another prison is GRANTED and the claims are DISMISSED, with prejudice, on the ground that they are barred by the statute of limitations;

2.    As a result of the dismissal of the claims stemming from plaintiff's placement in administrative segregation and transfer to another prison, no claims remain pending against defendants Ortiz and Stockman and they are DISMISSED from this action;

3.    Defendants' motion for summary adjudication on plaintiff's retaliation claim against defendant Busby is DENIED;

4.    Defendants' motion for summary adjudication on plaintiff's retaliation claim against defendant Chatham is GRANTED;

5.    Defendants' motion for summary adjudication on plaintiff's retaliation claim against defendant Busby based on qualified immunity is DENIED; and

6.    Defendants' motion to dismiss the state law claims against defendants Busby and Chatham is DENIED.

IT IS SO ORDERED.

**Dated:    August 16, 2006**             _____/s/ Lawrence J. O'Neill_____
b9ed48                                     UNITED STATES MAGISTRATE JUDGE

27